HARRISON and others vs. THE JUNEAU BANK.

An instrument in the following form: "Received from C. H. O. & Co., an order on F. W. H., clerk of the board of supervisors, &c., for all the orders drawn in favor of C. H. O. & Co., on account of, &c., * * said orders supposed to amount to about $1600, which are to be sold at their cash value, and the proceeds applied first in payment of S. & L.'s note of about $300 to H., H. & Co., and the balance to apply," &c.; is not a mere receipt; the latter part is a contract, and not open to explanation or contradiction by parol evidence further than any other contract in writing.

A complaint alleged that said instrument was executed in pursuance of an agreement between the maker thereof, the plaintiffs and C. H. O. & Co., and that the

name of "S. & L." was inserted by mistake for that of C. H. O. & Co. in describing the note to be first paid; and demanded judgment that the instrument be reformed. It also alleged that the maker of the instrument had received and disposed of the county orders therein mentioned, and refused on demand to pay the amount due on the note first described by the instrument when so reformed, to the plaintiffs, who were the owners thereof. *Held*, that the complaint set forth two causes of action, which should, in strictness, have been separately stated.

The cause of action for the reformation of said instrument was equitable, and was for trial by the court, unless formally submitted to the jury in the manner prescribed by the statute. R. S., ch. 132, sec. 6.

The cause of action for the recovery of money was legal, and was for the jury, unless a jury was waived.

Proceeding to a trial by jury without ordering the equitable cause to be so tried, was not, even though the parties did not object, a submission of that cause to the jury, so that the court might not withhold it from their consideration. The judge might still decide it himself, as he should find from the evidence, leaving the issue at law to the jury, if a verdict became necessary.

The correct practice in such cases is, to try the equitable cause first, and afterwards the legal.

But it was not error for the court in this case, after the plaintiffs had introduced all the evidence upon which they relied to sustain both causes of action, to nonsuit them on the ground that there was no sufficient evidence of the alleged mistake in the execution of the instrument sought to be reformed; it being impossible for them to recover in the jury trial while said instrument remained unreformed.

APPEAL from the County Court for *Milwaukee* County.

The plaintiffs in this action composed the firm of *Harrison, Hanford & Co.* The complaint alleges that on the 1st of February, 1861, C. H. Orton & Co., of Milwaukee, executed to them, for value, a promissory note for $372.13, dated on that day, and payable ninety days thereafter at the *Juneau Bank* in Milwaukee; that from said 1st of February to the 14th of May, 1861, said Orton & Co. were publishers and proprietors of the "Daily Milwaukee Press and News," and, under direction of the clerk of the board of supervisors of Milwaukee county, as provided by law, published the delinquent tax list for 1860; that on the 20th of March, 1861, Orton & Co. were indebted to the defendant in some amount not precisely known to the plaintiffs, and an arrangement was made on that day between the plaintiffs, the defendant and said Orton & Co., that

the amount that would be coming to the firm last named for publishing said delinquent tax list should be applied first to the payment of the above mentioned note of said firm to the plaintiffs, and the balance to the payment of the debt due the defendant from the same firm; that in pursuance of this arrangement, about the date last mentioned, Orton & Co. gave to one James Ludington, on behalf of the defendant, an order directed to F. W. Hundhausen, clerk of the board of supervisors of Milwaukee county, requiring him to deliver to said Ludington or order, all county orders to be issued in favor of Orton & Co. for said advertising, of all which the defendant had then and there due notice; that the order was received under the understanding and arrangement aforesaid; and that pursuant to that understanding, the defendant afterwards, by its cashier thereto duly authorized, gave Orton & Co. a receipt as follows:

"RECEIVED, Milwaukee, March 23, 1861, from Messrs. C. H. Orton & Co., an order on F. W. Hundhausen, clerk of board of supervisors Milwaukee county, for all the orders drawn in favor of C. H. Orton & Co., on account of advertising delinquent tax sale notice of county treasurer in the Milwaukee Press and News for this year, said orders supposed to amount to about $1600, which are to be sold at their cash value, and the proceeds applied first in payment of Sharpstein & Lathrop's note of about $300, to *Harrison, Hanford & Co.*, and the balance to apply on their note, secured by chattel mortgage. S. B. SCOTT, Cashier."

The complaint further avers that at the time aforesaid the plaintiffs had no note of about $300 against Sharpstein & Lathrop, and that the note intended to be described was that held by them against Orton & Co. as aforesaid; that on the 1st of April, 1861, there were duly issued to Orton & Co. six county orders of said county, amounting to $1621.75, for said advertising, which orders were afterwards delivered to said Ludington by said Hundhausen, pursuant to the above mentioned

order; that said county orders were afterwards sold by Ludington, and the amount realized on them exceeded $1,000; that the orders were returned to and paid by the county treasurer before February 4, 1862, and now remained cancelled in his office; that Orton & Co.'s note to the plaintiffs was not paid at maturity, and was protested for non-payment; that it remained still unpaid, except as to the sum of $45.91, paid July 1, 1861; that the plaintiffs, ever since its execution, had been and still were the lawful owners and holders thereof; that there was now due thereon $330.57, with interest &c.; and that on the 4th of February, 1862, the plaintiffs demanded of the defendant payment of the amount due on said note, out of the moneys realized on the sale of said county orders, which the defendant refused. The complaint therefore demanded judgment that the "receipt or contract" above set forth be reformed in accordance with the facts alleged, and also that the plaintiffs recover of the defendant the amount so alleged to be due.

The answer alleges, in substance, that the order upon Hundhausen, described in the complaint, was delivered to the defendant by Orton & Co., with directions to procure the county orders from Hundhausen and sell the same at their cash value, and out of their proceeds to pay a certain note given by Sharpstein & Lathrop to *Harrison, Hanford & Co.*, for about $300, and apply the balance on the indebtedness of Orton & Co. to the defendant; that the defendant executed to Orton & Co. a receipt for said order, specifying the conditions upon which it was delivered; that the plaintiffs were not parties or privies to the arrangement at that time or subsequently; that afterwards, before anything had been realized on said orders, Orton & Co. requested the defendant not to sell the orders, nor pay the note of Sharpstein & Lathrop running to the plaintiffs, but to surrender the orders to them, said Orton & Co., to be disposed of by them or by said Ludington; that thereupon the defendant did surrender the orders to Orton & Co., and the latter surrendered to the defendant its receipt for the order on Hundhausen,

and the above mentioned agreement between the defendant and Orton & Co. was cancelled by them.

The record states that on &c., "the issues made in this ac¹ tion" by the above pleadings, "came on to be tried before the judge of said court, and a jury was impanneled and sworn." *William A. Hanford*, one of the plaintiffs, as a witness on their part, identified a note shown him as the note of Orton & Co. to the plaintiffs, mentioned in the complaint. *Question :* "State whether in the spring of 1861, at any time subsequent to the date of that note, you made any arrangements on behalf of the plaintiffs with Orton & Co. for security for the payment of it, and if so, what was the arrangement, and when was it made?" *Answer :* "I was in Milwaukee in March, 1861, and talked the matter over with C. H. Orton, and made the arrangement with him. The publication of the county list was talked of definitely, and from the proceeds of that publication he pledged me the payment of that note. The orders, or the authority to pay them, were to be deposited at the Juneau Bank, to pay Orton & Co's. note to *Harrison, Hanford & Co.* That was as far as we had any claim on the orders; the balance went to' pay a claim the Juneau Bank had on Orton & Co. for their purchase of the News establishment. Our claim was to be paid first, and then the other. I rested on the matter then, and thought we had perfected the arrangement at that time. I was in Milwaukee in May, 1861, and called upon Mr. Scott, the defendant's cashier, with reference to the sale of those orders, and our part of the proceeds. I asked him if the county orders were disposed of, which had been deposited there? He said they were not. I then asked him to sell them so that we could have our pay. He said he could not at that time, as it was a part of the agreement with Orton & Co. that they were to be held for a favorable market. I gave it no further attention at that time. I called again on Scott in July; he made the same excuse that they were not ready to sell the orders. Nothing further occurred then that I remember; I

can't state definitely whether I had any interviews with Scott afterwards. The note about which I made this arrangement was this note of Orton & Co's. I didn't seek to make any arrangement about Sharpstein & Lathrop's notes; they were then secured abundantly; the Orton note was the only one I brought up in the conversations with Mr. Scott; my recollection is that I did not talk with Scott until after the receipt was given. The conversation I had with him in May is the first I ever had with him to my recollection; I left the matter with Butler, Buttrick & Cottrill, after arranging it with Orton & Co., to see that it was all properly arranged." On cross-examination he said: "We had several notes against Sharpstein & Lathrop in March, 1861. There were four notes of equal value, I think; I cannot now state when they matured. The amount of each, I think, was $391 and some cents. They were secured by chattel mortgage on the News establishment. I think Orton & Co. bought the News office during the winter of 1860–61. They never to us assumed the payment of Sharpstein & Lathrop's notes, but I understood they assumed them as between them and Sharpstein & Lathrop. I think more than one half of those notes were past due in March, 1861. They were in the hands of Butler, Buttrick & Cottrill for collection. I can't say when I left them there; it was long after they matured. I don't know whether they received any of them from the bank. I think some of them were put in there for collection. I can not now say whether some of them were paid at maturity; I hardly think they were. I had no talk with Scott till the early part of May. I had another interview with him in July; substantially the same talk occurred then. I never knew that a note of Sharpstein & Lathrop was mentioned in the receipt. Orton & Co's. note was mentioned in the conversations with Scott, and no other. There never was any talk that there was a mistake in the receipt." On re-examination he said: "I never saw the receipt till within ten

days past, and I saw then only a copy of it. I never saw the original receipt. It was within the past ten days that I discovered that this receipt was given as it is. The indorsement on the Orton note was for advertising and job work; it was done partly before and partly after March 23, 1861; we waited till July and after on the Orton note because of this arrangement; we didn't think it was necessary to call on Orton & Co. for it, because this arrangement had been made."

Charles H. Orton, as a witness for the plaintiffs, was shown the note of Orton & Co. mentioned in the complaint, and said: "I was the agent for Orton & Co., and as such executed that note. I heard a portion of the witness *Hanford's* testimony; I left collaterals in the shape of an order for the county orders with the Juneau Bank, to secure the payment of some note; I should think this was the note; I left them with Mr. Ludington, I think; the arrangement was made with him." Witness was shown the receipt mentioned in the complaint and said: "This receipt appears to be signed by Scott; the business was principally done by Ludington, who was acting in behalf of the bank. There was a receipt given something in this form, but I shouldn't think this was the one, but am not positive." On cross-examination, he said: "There were some things, I think, in the receipt that was given, that are not in this one, and so I think this not the same receipt. The orders were to be subject to my control, that is, I was to fix the time when they were to be sold, and they were not to be thrown into the market at reduced prices; I wouldn't say positively that there was anything else. I see, though, that it reads that the proceeds are to be applied to the payment of Sharpstein & Lathrop's notes. I had the impression that it was Orton & Co.'s note, perhaps no other difference. I submitted the receipt to Kelley at the time. I saw the receipt in July or August, 1861, the last time before to day; I took no minute of it at the time it was given. I think that this is not the receipt from my habit of doing business. This is what makes me

think this different; I am more positive as to the clause being in, giving me the right to fix the time of the sale of the orders, than I am as to its being Orton & Co.'s note. I couldn't say positively that it was Orton & Co.'s note. I made the arrangement with Ludington, and Scott, I presume, gave the receipt. I couldn't say who was present; may have been two or three others then in the bank, and may not. The plaintiffs were not there."

Dean S. Kelley as a witness for the plaintiffs, testified as follows: "In March and April, 1861, I was clerk in Butler, Butrick & Cottrill's office; I think I saw Scott the same day the receipt was given; I went down there at the direction of some member of the firm, to ascertain what the arrangement was; Orton had just shown me the receipt he had taken from Scott; he brought it into the office and showed it to me. I first saw the teller of the bank, who referred me to Scott, who was not in; I went back again the same or the next day, and saw Scott; I asked him about the arrangement, and told him that Orton had shown me the receipt, and what the purport of it was. He said to the effect that it was all right, that such an arrangement had been made. I probably described the note in speaking of it as the Orton note. I went to see him about the Orton note; that was my understanding of it. I had no conversation with him about any other note at that time. I told Mr. Butler what I had done, and he told me to take down the note and deposit it so that it should be there when the money was paid. I was going to do it, but Mr. Cottrill told me there was no necessity for it. Several days after, some one of the firm told me I had better take it down, and I went to the safe and took out the only note I found there belonging to *Harrison, Hanford & Co.* Butler, Buttrick & Cottrill usually kept the notes left with them to collect in an indorsed envelope. I took the envelope indorsed "Harrison, Hanford & Co. v. Orton & Co." I took out the only note that was in it, and took it down to the bank. That was April 3, 1861. The note

of Orton & Co. was not there. I think *Hanford* had the Orton note when I went down the first time. The Orton note might have been in the office, and not among the Sharpstein & Lathrop notes. I took the Sharpstein & Lathrop note to Scott, and handed it to him. He remarked that there must be a mistake about it, as it was described as a note for $300, and that was about $400. I told him I would see about it. I asked him to give me a receipt for the note, and he told me to bring down the bank book. I went back, and a day or two after told some of the firm what he had said about the discrepancy in the amount. Mr. Cottrill said it would make no difference, and that the bank would do what was right about it, or something to that effect. A day or two after, Mr. Cottrill came to me with the Orton note, and said, ' I thought you said you had deposited this note in the bank ? ' and then it was that I first discovered what note I had deposited, and I said I would go and get the note I had deposited and take the Orton note down. I went there and got the Sharpstein & Lathrop note.. I had left it with Scott; and I took it from Trowbridge, who entered it I think in the bank book." On cross-examination witness said : " The Sharpstein & Lathrop note was one of those, I believe, secured by chattel mortgage ; it was for $395.51 ; I cannot tell whether it was due then, but think it was. I told Scott I had seen the receipt, and told him enough so that he knew what receipt it was. I shouldn't think that was the same receipt, [is shown the one mentioned in the complaint,] if no question had been made about it. It is different from what I thought it was. I ran it over hurriedly when Orton showed it to me. I would not swear that this is not the same receipt, though where it describes the Sharpstein & Lathrop note, I thought, when Orton showed it to me, it was the Orton note, as that was the note talked of, and also as to Orton's controlling the sale of the orders. I think I knew then that Orton & Co. were to pay the Sharpstein & Lathrop notes. I looked at the envelope and took down the note found in it, but I

couldn't say that I then looked at the note at all. There was nothing said by Scott about the difference in the names on the notes."

J. P. C. Cottrill, as a witness for the plaintiff, testified as follows: "It is our habit to keep notes left with us for collection in an envelope separately, marked with the owners' and parties' names on them. The notes of the plaintiffs against Sharpstein & Lathrop, and Orton & Co., were kept in one envelope, which I now have in my hands, marked 'Harrison, Hanford & Co., vs. C. H. Orton & Co.' They were all kept together."

The defendant admitted that demand was made upon it for payment of the Orton & Co. note, as alleged in the complaint, and that the county orders mentioned therein had been returned and paid by the county treasurer as alleged.

The plaintiffs having rested, the defendant moved for a nonsuit and dismissal of the complaint: first, because there was not sufficient evidence to show that there was a mistake in the contract or receipt; secondly, because if that were reformed, the evidence would not be sufficient to entitle the plaintiffs to recover. The motion was granted, and judgment entered dismissing the complaint; from which the plaintiffs appealed.

*Butler & Cottrill*, for appellants:

1. In law, the receipt is what it purports to be, a mere receipt. It was made after the contract was made, and is merely evidence of what the contract was. We submit that it falls fairly within the principle laid down in *Southwick vs. Hayden*, 7 Cowen, 334, where the court says: "Although a written contract cannot be varied or proved by parol, I apprehend this rule is not applicable in its full extent to a receipt given on the delivery of money or articles." See also *Haddock vs. Kelsey*, 3 Barb. (S. C.), 100; *Phelps vs. Bostwick*, 22 id., 314; *Wadsworth vs. Alcott*, 2 Seld., 64. All the facts of the complaint were either admitted or fully proved, except the single one as to the mistake, and upon that there was evidence enough to have warranted a verdict in our favor, if uncontradicted. 2.

But if the receipt was a contract requiring reformation to enable the plaintiff to recover, still the ruling below was erroneous. In this view the complaint is good upon demurrer. It unites two causes of action, one legal and one equitable, both " arising out of the same transaction, connected with the same subject of action." It is clearly within the statute relative to the joinder of causes of action. R. S., ch. 125, secs. 29, 30. In this view, the issue was triable by the court, under sec. 6, ch. 132, unless the whole issue, or some specific question of fact involved, was referred to the jury. This was substantially done in this case. The jury was impanneled and sworn; the cause proceeded, and all the evidence was introduced before them. The verdict should, in this view, have been special, under sec. 10, ch. 132. The findings of fact would, by that section, have been conclusive, as, in such cases, the judgment only is left to the court. Judgment then would have been entered pursuant to sec. 16, ch. 132.—The case having been submitted to the jury, we submit that they were entitled to pass on the questions at issue.

*Cary & Pratt*, for respondent.

*By the Court*, DIXON, C. J. The instrument set forth in the complaint is not a simple receipt. It is more. That part which relates to the mode of sale and the application of the proceeds of the county orders, is a contract, and not open to explanation or contradiction by parol evidence farther than any other contract. 2 Pars. on Con., 67, and cases cited.

The complaint, therefore, contains two distinct causes of action, the one equitable, the other legal, which in strictness should have been separately stated. R. S., ch. 125, sec. 29. That for the reformation of the contract is equitable, and was for trial by the court, unless formally submitted to the jury in the manner prescribed by the statute. R. S., ch. 132, sec. 6. The other cause of action, for the recovery of money, is legal, and was for the jury, unless that mode of trial was waived.

Proceeding to a trial by jury without ordering the equitable cause to be so tried, was not, even though the parties did not object, a submission of that cause to them so that the court might not still withhold it from their consideration. The judge might, nevertheless, have decided it himself according as he should find from the evidence, leaving the issue at law to the jury in case a verdict at their hands became necessary. The correct practice in such cases no doubt is to try the equitable cause first, and afterwards the legal. But as that practice was not adopted, we see no absolute impracticability in the course which was pursued.

Regarding the judgment of nonsuit, so far as it was granted on the ground of insufficiency of the evidence to show a mistake in the making of the instrument, as a decision by the court of the equitable cause, the question is resolved into one of mere fact, and that is, whether the mistake was made out. Upon this point we agree entirely with the court below. There is no definite and satisfactory proof that a mistake was made. The plaintiff *Hanford* knows nothing about it, and the only witness having knowledge or means of knowledge is Orton. His testimony falls far short of the clearness and certainty required by law in such cases. *Lake vs. Meacham*, 13 Wis., 355. At most it only raises a suspicion of mistake. It does not establish it beyond reasonable controversy.

Judgment affirmed.